FILED

2012 Jan-12  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **SAN FRANCISCO RESIDENCE CLUB, INC., et al.,** | ) ) ) ) | |
| Plaintiffs | ) | Civil Action Number |
| vs. | ) ) | **5:08-cv-1423-AKK** |
| **PARK TOWER, LLC, et al.,** | ) ) | |
| Defendants | ) ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are cross motions for summary judgment filed by Samuel H. Givhan ("Givhan") and Wilmer & Lee, P.A. ("Wilmer & Lee") (collectively "Defendants"), doc. 278, and Kate Donahue ("Donahue"), Grandview Credit, LLC ("Grandview Credit"), Anne Donahue O'Shea ("Anne O'Shea"), Thomas O'Shea, San Francisco Residence Club, Inc. ("SFRC"), and trustees of the Thomas and Anne Donahue O'Shea Trust ("O'Shea Trust") (collectively "Plaintiffs"), doc. 280.  Based on the following reasons, Defendants' motion for summary judgment, doc. 278, is **GRANTED in part** and **DENIED in part**, and Plaintiffs' motion for summary judgment, doc. 280, is **DENIED**.  In light of this ruling, trial by jury will be set for the only two remaining issues: (1) whether, under California law, Defendants breached their fiduciary duty as escrow agents to the § 1031 Plaintiffs and (2) whether Defendants violated California's Elder Abuse Statute by taking,

secreting, appropriating, obtaining, or retaining real or personal property of Tom
O'Shea for a wrongful use or with intent to defraud.

## I.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary
judgment is proper "if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law."  To
support a summary judgment motion, the parties must cite to "particular parts of
materials in the record, including depositions, documents, electronically stored
information, affidavits or declarations, stipulations, admissions, interrogatory
answers, or other materials."  FED. R. CIV. P. 56(c).  Moreover, "Rule 56(c)
mandates the entry of summary judgment, after adequate time for discovery and
upon motion, against a party who fails to make a showing sufficient to establish
the existence of an element essential to that party's case, and on which that party
will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986).  The moving party bears the initial burden of proving the absence of a
genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the
nonmoving party, who is required to "go beyond the pleadings" to establish that
there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation
marks omitted).  A dispute about a material fact is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."  *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the
evidence and all reasonable inferences arising from it in the light most favorable to

the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970);

*see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the

non-moving party's favor). However, "mere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v.

England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald

Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover,

"[a] mere 'scintilla' of evidence supporting the opposing party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for

that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing

*Anderson*, 477 U.S. at 252).

## II.   FACTUAL AND PROCEDURAL HISTORY

This litigation arises from a multi-million dollar ground lease real estate

transaction in Huntsville, Alabama. Defendants are Wilmer & Lee, P.A., a

Huntsville, Alabama law firm and Samuel H. Givhan, a shareholder in the law

firm. The individual Plaintiffs—Donahue, Anne O'Shea, and Tom O'Shea—are

California residents. SFRC is a closely-held California corporation. Grandview

Credit is a California limited liability company whose sole member is Jack

Chillemi. The O'Shea Trust is organized under the laws of California. *See* doc.

279, at 6-7; doc. 285, at 10-11.

## A.   Previous Huntsville Transactions

Plaintiffs began seeking real estate investment opportunities in Huntsville,

Alabama around November of 2006 when Tom O'Shea met with Scott McDermott

("McDermott"), an Alabama real estate professional.  Doc. 279-2, at 16.

Plaintiffs' Huntsville real estate investing began in January 2007, when

McDermott directed Givhan to organize Moquin, LLC and Fountain Partners,

LLC, and in April 2007, when McDermott directed Givhan to organize Corporate

Drive, LLC.  McDermott prepared and distributed Private Placement

Memorandums ("PPMs") for Moquin, LLC and Fountain Partners, LLC to

Plaintiffs.  *See* doc. 279, at 10; doc. 285, at 13-14.  On May 8, 2007, Tom O'Shea

and SFRC purchased Class B membership units in Moquin, LLC and Foundation

Partners, LLC.  Docs. 279-29, 279-30.  Givhan closed these transactions.  Doc.

279, at 10; doc. 285, at 14-15.  On July 13, 2007, Donahue and the O'Shea Trust

purchased Class B membership units in Corporate Drive, LLC.  Doc. 279-31.

**B.      The Park Tower Transaction**

In February 2007, McDermott informed Tom O'Shea of an investment

opportunity in the Park Tower property, 200 West Side Square, Huntsville,

Alabama.  Doc. 279-2, at 38; doc. 279-33.  On February 15, 2007, McDermott

directed Givhan to organize Park Tower, LLC.  Doc. 279, at 12; doc. 285, at 16.

Park Tower, LLC and West Side Square, LLC executed a real estate contract for

the Park Tower property on March 2, 2007.  Doc. 279-33.  The O'Shea Trust

signed this real estate contract on behalf of Park Tower, LLC.  *Id.* at 6.

Park Tower, LLC acquired the Park Tower property on September 24, 2007.

Defendants served as closing attorney, escrow agent, and title insurance agent for

this transaction.  Doc. 279, at 13; docs. 285-11, 285-12, 285-13; doc. 214, at 65.  It

is undisputed that the O'Shea Trust, Donahue, and SFRC sent funds to Defendants' firm trust account on September 21, 2007.  Docs. 285-11, 285-12, 285-13.  It is also undisputed that Defendants used these funds to close the purchase of the Park Tower property through Park Tower, LLC.  *See* doc. 279, at 13; doc. 285, at 18.  Moreover, Plaintiffs signed numerous documents pertaining to Park Tower, LLC concurrently with the closing of the Park Tower transaction.  *See* doc. 279-37 (Park Tower, LLC Unanimous Written Consent Agreement); doc. 279-38 (Park Tower, LLC Unsecured Indemnity Agreement); doc. 279-39 (Park Tower, LLC Unsecured Environmental Indemnity Agreement).  However, the parties dispute whether, during the closing, Plaintiffs actually purchased interests in Park Tower, LLC.  Doc. 285, at 20-21; *see also* doc. 281, at 6; doc. 285, at 39 n.15.  The parties also dispute whether Plaintiffs specifically instructed Defendants to close the real estate transaction in compliance with 26 U.S.C. § 1031.[1]  Doc. 279, at 13; doc. 285, at 17-18.  Park Tower, LLC issued Class B membership unit certificates to Plaintiffs on July 10, 2008.  Doc. 153-23.  And, on August 26, 2008, after Plaintiffs initiated the current litigation, McDermott, on behalf of Plaintiffs, executed an Operating Agreement for Park Tower, LLC establishing that Plaintiffs owned Class B membership units in Park Tower, LLC. Doc. 279-41.

## C.   Procedural History and Settlements

---

[1] Internal Revenue provision allowing deferred gains for "like-kind" exchanges of property.

Originally filed in August 2008, this litigation is now in its fourth year. Various parties have settled claims and counterclaims, and here, the parties litigate Plaintiffs' Third Amended Complaint, filed against Park Tower, LLC; McDermott; Roy F. Claytor, Jr.; William M. Chapman; Highlands Management Company, LLC; Huntsville Commercial Brokerage, LLC; Claytor-Phillips Holdings, LLC, d/b/a Coldwell Banker Real Estate, LLC; and Defendants.  Doc. 145.  In addition to claims for compensatory damages based on a variety of legal theories, Plaintiffs pray for Park Tower, LLC to "assign any and all rights it may have in the [Park Tower property] to the Plaintiffs as tenants-in-common in accordance with their pro rata ownership interests."  *Id.* at 66.

The Third Amended Complaint pleads six claims against the Defendants here.  All Plaintiffs allege Alabama securities law violations against Defendants (Counts 4 and 5).  The O'Shea Trust, SFRC, and Donahue (collectively the "§ 1031 Plainitffs") bring a claim for damages under the Alabama Legal Services Liability Act (Count 6).  The § 1031 Plaintiffs also seek damages against Defendants for negligence, wantonness, or fraud in connection with the Park Tower transaction closing, and damages for breach of Defendants' fiduciary duty as escrow agent to the Park Tower closing (Counts 7 and 8).  Finally, Tom O'Shea seeks damages against Defendants for violation of California's Elder Abuse statute (Count 14).

The only defendants named in the Third Amended Complaint who have not settled with Plaintiffs are Givhan and Wilmer & Lee.  *See* doc. 279, at 19 n.4.  In

light of their settlement with the "McDermott Defendants,"[2] *see* doc. 279-45 (filed under seal); doc. 285, at 21, Plaintiffs now have complete ownership and control of the Park Tower property. *Id.*; *see also* doc. 279, at 15.  Finally, it is undisputed that Plaintiffs eventually reformed the Park Tower Property deed "to reflect ownership as tenants in common as of the date of closing, and the transaction complies with § 1031."  Doc. 279, at 16; doc. 285, at 21.

Currently before this court are Plaintiffs' motion for partial summary judgment regarding the Alabama securities law claims, doc. 280, and Defendants' motion for summary judgment on all claims, doc. 278.  Both motions are fully briefed, docs. 284, 285, 286, and 287, and ripe for adjudication.

## III.   ANALYSIS

### A.   Applicable Law

The parties disagree as to the proper law governing this case.  *See* doc. 285, doc. 286.  Plaintiffs contend that California law applies to all claims against Defendants; whereas, Defendants contend that Alabama law applies.  "A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state." *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007).  "As a preliminary matter, the court must characterize the legal issue and determine whether it sounds in torts, contracts, property law, etc.

---

[2] Included as the McDermott Defendants: McDermott; Park Tower, LLC; Roy F. Claytor Jr.; William M. Chapman; Highlands Management Company, LLC; Huntsville Commercial Brokerage, LLC; and Claytor-Phillips Holdings, LLC.

Once it has characterized the legal issue, it determines the choice of law rule that the forum state applies to that particular type of issue." *Id.* A court may apply the laws of different states to different legal issues in the case. *See e.g.*, *Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d 1515 (11th Cir. 1993). "Alabama law follows the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti* . . . . Under the principles of *lex loci contractus*, a contract is governed by the law of the jurisdiction within which the contract is made . . . . Under the principle of *lex loci delicti*, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, 17 So. 3d 200, 213 (Ala. 2009).

In regard to the Alabama securities law or "Blue Sky" law claims (Counts 4 and 5), Plaintiffs simply cannot bring claims under specific Alabama statutes, doc. 145, at 43-44, and then attempt to argue that California law applies in the enforcement and interpretation of these Alabama statutes.  Doc. 285, at 38.  If Plaintiffs wanted to bring claims under California's statutory securities laws, then they should have done so in the original complaint.  A cause of action under Alabama's Blue Sky laws arises solely from an Alabama statute; thus, only Alabama law can apply to these securities claims.  *Cf. Houston v. Whittier*, 216 P.3d 1272, 1279 (Id. 2009) (holding that "[b]ecause these two causes of action are created by statute, the issue is not choice of law").[3]

---

[3] For the same reasons, California law applies to the elder abuse claim brought under California statute.

However, California law applies to the remaining common law tort claims (Counts 7 and 8),[4] which allege financial injuries—specifically that Defendants' negligence, wantonness, fraud, recklessness and breach of fiduciary duty in handling the Park Tower transaction, as closing attorney and escrow holder, damaged the financial interests of Plaintiffs.  Doc. 145, at 47-50; doc. 285, at 36-37.  These common law claims sound in tort; accordingly, the court must utilize Alabama's *lex loci delicti* approach to determine the applicable law.  "*Lex loci delicti* has been the rule in Alabama for almost 100 years.  Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Fitts v. Minn. Mining & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991).  The *lex loci delicti* doctrine establishes that "'it is not the site of the alleged tortious act that is relevant, but the site of the injury, or the site of the event that created the right to sue.'" *Chambers v. Cooney*, No. 07-0373-WS-B, 2007 WL 2493682, at *10 (M.D. Ala. Aug. 29, 2007) (quoting *Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1347 (S.D. Ala. 1998)). Moreover, the Eleventh Circuit, in applying *lex loci delicti*, stated "[t]he place of wrong is the jurisdiction where the harm was suffered or where the last event necessary to make an actor liable for the alleged tort takes place . . . . Because [plaintiff] resided at all relevant times in Georgia any harm suffered as a result of the fraud occurred there." *Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d

---

[4] Plaintiffs voluntarily dismissed Count 6.  Doc. 285, at 38.

1515, 1521 (11th Cir. 1993); *see also Garland v. Advanced Med. Funds*, 86 F.

Supp. 2d 1195, 1205 (N.D. Ga. 2000) (applying *lex loci delicti*, the court held

"[plaintiffs] resided at all relevant times in Florida and bore the economic impact

of the alleged torts in Florida.  Therefore, any harm suffered as a result of the

fraud, misrepresentation, fiduciary breach, or civil theft occurred in Florida.").

Plaintiffs argue that the proper "site of injury" is California because they are

residents of California or California entities, and accordingly, their financial injury

occurred in California.  Doc. 285, at 37.  Defendants, however, assert that "public

policy demands that this court apply Alabama law."  Doc. 286, at 12.  The court

finds Defendants' arguments unpersuasive because, for the current common law

claims, there is no overarching Alabama public policy that demands the

application of Alabama law in the face of *lex loci deliciti*.[5]  To support their

argument, Defendants contend:

> If Givhan were subjected to California law, closing attorneys in
> Alabama that close deals/transactions on Alabama properties
> involving multiple out-of-state parties would subject themselves to
> the laws of all states where any party to the transaction happens to
> reside.  This would place extraordinary burdens on Alabama real
> estate attorneys because they would be required to research the laws
> of each state where a party to the transaction resides to ensure the
> appropriate standard of care is followed and that there are not any

---

[5] On the other hand, the court is inclined to agree with Defendants that in this case, given the substantial contacts with Alabama, the application of *lex loci deliciti* produces a bizarre result.  However, this court is bound by Alabama law, and "[t]he newer approaches to choice of law problems are neither less confusing nor more certain than the traditional approach. Until it becomes clear that a better rule exists, we will adhere to our traditional approach." *Fitts*, 581 So. 2d at 823 (internal citations and quotation marks omitted).

provisions that differ from Alabama law, such as alleged "escrow agent" duties.

Doc. 286, at 14.  Yet, when alleged tortious conduct creates financial injury, such result is the nature of the *lex loci deliciti* beast.  Parties are held to the legal standards of where the tort arises, and for claims such as negligence, wantonness, recklessness, fraud, and breach of fiduciary duty, the tort becomes vested where the injury is suffered.  *See e.g.*, *Garland*, 86 F. Supp. 2d 1195; *Glass*, 990 F. Supp. 1344 (using Alabama's *loci deliciti* rule to apply Alabama substantive law when all aspects of an allegedly fraudulent transaction occurred in Georgia, but the plaintiff "suffered the economic impact" in Alabama).  In short, because Plaintiffs suffered their alleged financial injury arising from the common law tort claims in California, California law governs these claims.

## B.   Judicial Estoppel

Defendants first contend that Plaintiffs are judicially estopped from bringing any claim against them because "[c]laiming with the IRS that the Park Tower transaction complied with [26 U.S.C.] § 1031 and accepting the benefit of deferring gains, while at the same time pursuing this lawsuit claiming that the transaction did not comply with § 1031 are clearly inconsistent positions."  Doc. 279, at 24.  However, equity does *not* require the court to dismiss this lawsuit in its entirety.  Plaintiffs seek damages for the cost, allegedly caused by Defendants' misconduct, of reforming the Park Tower property deed to conform to the § 1031 statutory requirements.  In regard to the tax returns, Plaintiffs produce some

evidence that they filed the returns with the understanding that the Park Tower deed originally complied with § 1031. Moreover, Plaintiffs did not subsequently amend the potentially erroneous returns because their tax attorneys advised them that reforming the property deed could retroactively cure any tax liability. *See* doc. 191-15, at 12; doc. 191-10, at 57; doc. 279-6, 117:18-118:16 (under seal). Thus, the evidence is sufficient at this juncture for the court to find that Plaintiffs are not maliciously taking inconsistent positions such that they cannot seek damages for Defendants' alleged misconduct.

## C.    Alabama Securities Law Claims[6]

Plaintiffs seek to recover in Counts 4 and 5 of the Third Amended Complaint, doc. 145, at 43-44, consideration paid for Class B membership units in Park Tower, LLC, together with interest, attorneys fees, costs and expenses, based on the legal theory that Defendants materially aided in the illegal sale of unregistered securities, doc. 280, at 2.[7]   The court finds that there is a genuine

---

[6] Defendants assert that this court must consolidate Plaintiffs' securities law claims under the Alabama Legal Services Liability Act ("ALSLA") because Defendants are "legal service provider[s]." Doc. 279, at 32. However, the allegations derive from the theory that Defendants materially aided in the sale of securities by purportedly operating outside of the legal advisory context. Doc. 281, at 11. "'[T]he ALSLA does not apply to an action filed against a "legal service provider" by someone whose claim *does not arise out of the receipt of legal services*.'" *Fogarty v. Parker, Poe, Adams, and Bernstein, L.L.P.*, 961 So. 2d 784, 789 (Ala. 2006) (quoting *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800, 804 (Ala. 1999) (emphasis added)). Therefore, the ALSLA is not the proper analysis for the securities law claims.

[7] The court finds it difficult to reconcile Plaintiffs' contradictory arguments. Outside of their securities claims, Plaintiffs' entire argument is premised on the allegation that they had no interest in Park Tower, LLC when Defendants "wrongfully" distributed funds to Park Tower,

issue of material fact as to whether the Park Tower, LLC Class B membership units are "securities" as defined by ALA. CODE § 8-6-2(10).  However, the court also holds that, even if the units are "securities" under Alabama law, the Defendants did not "materially aid" in the sale of these securities and cannot be held liable for Alabama securities law violations.  *See* ALA. CODE § 8-6-19(c). Accordingly, Plaintiffs' Motion for Summary Judgment, doc. 280, is **DENIED**, and Defendants' Motion for Summary Judgment, as it pertains to Counts 4 and 5, is **GRANTED**.

Alabama's Blue Sky laws provide in relevant part that any person who "[s]ells or offers to sell a security in violation of any provision of this article" is liable "to the person buying the security from him . . . ."  ALA. CODE § 8-6-19(a). Such liability also attaches to "every dealer or agent who materially aids in such conduct . . . ."  *Id.* § 8-6-19(c).[8]  Therefore, as a prerequisite to Plaintiffs' claim for

LLC.  However, in their securities law claims, Plaintiffs contend that Park Tower, LLC did in fact sell Class B membership units to them during the Park Tower transaction closing.  In an attempt to resolve this contradiction, Plaintiffs assert that their admittance of purchasing Park Tower, LLC interests only applies to their own motion for summary judgment, but "in actuality, Plaintiffs were led to believe, and did believe, that they were purchasing undivided interests as tenants in common as required by § 1031."  Doc. 285, at 30 n.15.  However, such statement pertaining to what Plaintiffs *believed* fails to resolve the internal factual paradox of whether Plaintiffs owned an interest in Park Tower, LLC at the time of the Park Tower closing. Fortunately, the court is not required to expand on this issue because Plaintiffs' Alabama securities claims fail as a matter of law even when accepting Plaintiffs' contradictory assertion that they *were sold* an interest in Park Tower, LLC.

[8]  Plaintiffs contend that they are entitled to summary judgment because Defendants failed to register the Class B membership units with the Alabama Securities Commission.  ALA. CODE § 8-6-4; doc. 281, at 13.  However, this code section only imposes liability for the entity that "offer[s] or sell[s]" the security or an agent who materially aids in such sale.  *Id.*  As discussed

rescission and damages, they must demonstrate that Defendants "materially aided" in the sale of "securities."

     i.    *A genuine issue of material fact exists as to whether the Class B membership units in Park Tower, LLC constitute "securities" under Alabama's Blue Sky Laws.*

Plaintiffs contend that their investment in Park Tower, LLC constituted an "investment contract" which is a type of "security" under ALA. CODE § 8-6-2(10). *See* doc. 281, at 8; doc. 285, at 39. The court cannot determine, as a matter of law, that the Park Tower, LLC membership units constitute "securities." Accordingly, Plaintiffs' offensive motion for summary judgment, doc. 280, is **DENIED**.

The Alabama Supreme Court determined that an investment contract is "'the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *Burke v. State*, 385 So. 2d 648, 651 (Ala. 1980) (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)). The parties stipulate that Plaintiffs invested monies in a common venture with the reasonable expectation of profits. *See* doc. 284, at 10. However, whether Plaintiffs expected such profits "to be derived from the entrepreneurial or managerial efforts of others" is a material fact in dispute. *See id.*

--------------------------------

*infra*, Defendants did not materially aid in the sale of the Class B membership units, and, as such, they cannot be liable for failing to register these "securities." Therefore, the court need not address whether these "securities" are exempt from registration under ALA. CODE § 8-6-11 because Defendants face no potential liability under § 8-6-4.

In *Burke*, the court established that the critical inquiry is "whether the effort made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure and success of the enterprise." *Burke*, 385 So. 2d at 652 (citations omitted).  Moreover, "an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have little direct effect upon receipt by the participant of the benefits promised by the promoters."  *Id.* (citations and internal quotation marks omitted).

Plaintiffs make two arguments to support their contention that Park Tower, LLC membership units are "securities."  First, Plaintiffs assert that the Park Tower, LLC Operating Agreement is similar to the Moquin, LLC Operating Agreement which purportedly offered "securities" to investors.  Doc. 281, at 6-7. Plaintiffs contend that Moquin, LLC issued "securities" because the accompanying Private Placement Memorandum identified the membership units as "securities."  Doc. 281, at 7 (citing Doc. 153-1, at 1).  However, Plaintiffs fail to provide the court with a similar Private Placement Memorandum for Park Tower, LLC.  Accordingly, the court cannot agree with Plaintiffs' comparison because it requires too large of a logical leap—specifically that the absence of a Private Placement Memorandum and/or the failure to include language containing the term "securities" in any such document was an inadvertent rather than an intentional omission.  Moreover, even if Plaintiffs are correct that the Operating Agreements for Park Tower, LLC and Moquin, LLC are "identical except in

certain immaterial respects," doc. 281, at 7, such similarities fail to demonstrate, without more, that either company utilized an "investment contract."

Second, Plaintiffs assert that the Park Tower, LLC Operating Agreement "expressly states that McDermott was to manage the enterprise and made it impossible to remove him without the consent of the McDermott Defendants."  As such, Plaintiffs argue that the third *Burke* consideration is satisfied.  Doc. 287, at 6.  In order to find that the Operating Agreement creates an investment contract, the duties for the non-Plaintiff investors must be "the undeniably significant ones" and the Plaintiffs' duties under the Agreement must be "nominal or limited and would have little direct effect upon receipt by the participant of the benefits promised by the promoters."  *See Burke*, 385 So. 2d at 652.  Plaintiffs cannot make this showing because the Park Tower, LLC Operating Agreement gives all holders of membership units the "mandatory right to vote" on, among other things, Amendments to the Articles of Organization, Amendments to the Operating Agreement, transactions involving potential conflicts of interest, admission of new or substitute members, sale or transfer of the majority of company's assets, merger of company, mortgage or security interest on company assets, and "[a]ny *significant purchase, receipt, lease, exchange, or other acquisition of real property, personal property or business*."  Doc. 279-41, at 14 (emphasis added). Therefore, while the Operating Agreement provides that McDermott served as "Manager" of the company, the voting rights given to Plaintiffs prevents the court from finding, as a matter of law, that they merely possessed a "nominal or limited"

role and could not directly affect the receipt of profits from the investment.[9]

> ii. *Defendants did not "materially aid" in the sale of Park Tower, LLC Class B membership units.*

However, regardless of whether the Class B membership units are considered "securities," Defendants did not act as agents of Park Tower, LLC to "materially aid" in the sale of such units. *See* doc. 281, at 11. Alabama law provides little guidance for interpreting the phrase an "agent who materially aids" in the sale of securities. *See* ALA. CODE § 8-6-19(c). The title does define "agent" as "any individual other than a dealer who represents a dealer or issuer in effecting or attempting to effect sales of securities . . . ." ALA. CODE § 8-6-2(2). Moreover, in the only relevant decision, the Alabama Supreme Court established that the phrase "materially aids" expands "liability to groups of persons beyond the [actual] seller of the security." *Foster v. Jesup and Lamont Securities Co., Inc.*,

---

[9] Defendants also contend that they are due summary judgment under *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981), because the Park Tower, LLC membership units are *not* securities as a matter of law. However, *Williamson* addressed the federal securities law definition of "investment contract;" therefore, it is not dispositive for claims under Alabama securities law. Moreover, even if considered persuasive authority, the factors *Williamson* outlined to determine the existence of an investment contract lead to the same conclusion—that there is a genuine issue of material fact. *Id.* at 424 (considering such factors as "(1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers."). These questions of power, experience, knowledge of business affairs, and dependence are factual matters that the parties vigorously dispute. *See e.g.*, doc. 284, at 13-16; doc. 285, at 1-3.

482 So. 2d 1201, 1206 (Ala. 1986) (answering certified questions from the United States Court of Appeals for the Eleventh Circuit).  The court held that the test for "materially aiding" in the sale of securities is less stringent than whether the entity was a "substantial factor" in the sale of such securities.  *Id.* at 1207.  However, beyond these two broad conclusions, the court only decided that "[u]nder the facts of this case, a jury was justified in finding that Jesup & Lemont materially aided the sale to Foster, and it is, therefore, secondarily liable under § 8-6-19."  *Id.* at 1207-08.

Unfortunately, the facts of *Foster* do not generate a strong legal comparison to the instant case.  The defendant in *Foster* was a New York securities broker-dealer or securities firm that agreed to use its "best efforts" in promoting or selling shares of Texas Partners, a Texas Limited Partnership.  *Id.* at 1201-02.  Although the defendant subsequently rescinded its agency agreement to sell the shares, defendant's official name still appeared on an Offering Memorandum, and its employees made statements insinuating continued involvement with Texas Partners.  *Id.* at 1202-04.  The plaintiff testified that in purchasing shares or securities of Texas Partners, he relied on the defendant's continued involvement in the venture.  Based on these facts, the court concluded that a reasonable jury could find the defendant "materially aided" in the sale of Texas Partners securities.  *Id.* at 1207-08.  Thus, in *Foster*, the defendant broker-dealer contracted to sell the securities for the limited partnership, subsequently rescinded that contract, but still acted as though it was the "issue's primary best efforts underwriter."  *Id.* at 1205.

In other words, the Defendants' actions here do not come close to the level of participation seen in *Foster*.

Because Alabama law fails to specifically address the type of involvement or participation required to find an attorney or law firm liable for materially aiding in the sale of securities under ALA. CODE § 8-6-19(c), the court must consider persuasive authority.[10]  In that regard, the court considers first *In re Infocure Securities Litigation*, 210 F. Supp. 2d 1331 (N.D. Ga. 2002), a case in which the plaintiffs filed suit against the law firm that represented a settled-defendant in "a series of transactions in 1999 in which the Defendant Infocure acquired companies owned by Plaintiffs in exchange for Infocure stock." *Id.* at 1335.  In addressing the plaintiffs' complaint, the court analyzed attorney liability under South Carolina, North Carolina, Michigan, Georgia, and Florida's Blue Sky laws.  *Id.* at 1362-67.  This court will focus, however, on the analysis pertaining to South Carolina and Michigan law because, like ALA. CODE § 8-6-19(c),  these states impose secondary liability on agents who materially aid in the sale of securities. *Id.* (citing S.C. CODE ANN. § 35-1-1500; MICH. COMP. LAWS § 451.810(b)).

Regarding the South Carolina statute, the court acknowledged that an "agent" is an individual "who represents a broker-dealer or issuer in effecting or attempting to effect the purchases or sales of securities." *Id.* at 1364 (citing S.C.

---

[10] "In the absence of authority directly on point, we must determine the issues of state law as we believe the [Alabama] Supreme Court would."  *CSX Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788, 790 (11th Cir. 1999).

CODE ANN. § 35-1-20(2)).  However, this definition "does not cover professionals such as attorneys engaged in their traditional advisory functions;" rather it covers "persons who assist directly in offering securities for sale, soliciting offers to buy, or performing the sale . . . ." *Id.* (citing *CFT Seaside Inv. L.P. v. Hammet*, 868 F. Supp. 836, 844 (D.S.C. 1994)).  As such, the court refused to impose liability on the defendant law firm because "[n]othing in the record here suggests that [the firm] stepped outside the bounds of attorneys in a run-of-the-mill merger transaction." *Id.*  The court reached the same conclusion with respect to the Michigan statute which also provided that an "agent who materially aids in the sale" of securities can be liable under Michigan securities law. *Id.* at 1366 (citing MICH. COMP. LAWS § 451.810(b)).  The court held that "attorneys for the seller, who perform duties within the normal ambit of transactional professionals, may not be held liable as an . . . 'agent' of the seller who materially aided in the sale of securities." *Id.*

Significantly, *Infocure*'s holding is not unique.  In *Ward v. Bullis*, 748 N.W.2d 397 (N.D. 2008), investors in a limited liability company ("LLC") filed a suit for securities fraud against the attorney who formed the LLC.  Interpreting whether an entity "effect[ed] or attempt[ed] to effect purchases or sales of securities," the court found that "an attorney is not liable as an agent unless the attorney: 'act[s] in a manner that goes beyond legal representation.  The definition of "agent" . . . does not include attorneys who merely provide legal services, draft documents for use in the purchase or sale of securities, or engage in their

profession's traditional advisory functions.  To rise to the level of "effecting" the purchase or sale of securities, the attorney must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale.'" *Id.* at 403-04 (citing *Baker, Watts & Co. v. Miles & Stockbridge*, 620 A.2d 356, 368 (Md. Ct. Spec. App. 1993) *superseded on other grounds by* MD. CODE ANN. § 2-504).  *See also Rendler v. Markos*, 453 N.W.2d 202, 206-07 (Wis. Ct. App. 1990) (reaching the same conclusion).  Accordingly, the court reversed the trial court's summary judgment in favor of the attorney, finding that a material dispute existed as to whether the defendant attorney satisfied this definition.  *Ward*, 748 N.W.2d at 405. The court focused on plaintiffs' allegations that the attorney:

> [P]lanned or assisted in the planning of the investment scheme, hired [a stockbroker], traveled to Australia and Arizona to assist in purchasing the stock, acted as the 'secretary' of at least one of the limited liability companies, drafted investment documents and was responsible for making sure that they were filled out and returned, accepted the investment documents without [seller's] signature, received the investment funds into his firms trust account and disbursed the funds, received 5% of the sales in addition to a flat or hourly fee for his legal services, issued the investors' shares or units, and advised [plaintiff] that he was an "accredited investor" when [plaintiff] questioned whether he could purchase the stock because he was not an accredited investor.

*Id.* at 405-06.  Stated simply, the court concluded that the defendant attorney may not have initially solicited the plaintiff's purchase of the LLC securities, but "his role in the investment scheme was more than that of an attorney who merely provided legal services and drafted documents."  *Id.* at 406.

Finally, in *Hammet*, 868 F. Supp. at 838, defendant attorneys represented a Limited Partnership created in relation to certain real-estate transactions on Hilton Head Island, South Carolina.  "Defendants' role was to provide legal services on matters pertaining to South Carolina law required for the [development project] concerning real estate law and developmental approval issues." *Id.* at 839.  In reliance on the legal opinions, the plaintiffs invested in the Limited Partnership, and the defendant attorneys drafted the documents for the investment. *Id.*  When the investment turned south, due to errors in the zoning and land use advice defendants provided, the plaintiffs filed state securities claims against the defendants. *Id.* at 841.  The court granted defendants' motion for summary judgment based, in part, on a finding that the attorneys did not fall under South Carolina's Blue Sky laws' definition of "agent" because the attorneys did not "effect[] or attempt[] to effect purchases or sales of securities." *Id.* at 844 (citing S.C. CODE ANN. § 35-1-20(2)).

Again, the court held that the "definition of 'agent' . . . does not include attorneys who merely render legal advice or draft documents for use in securities transactions . . . . It is not intended to cover professionals such as attorneys engaging in their traditional advisory functions." *Id.*  The court supported this finding by revealing that a separate provision of South Carolina securities law requires a "broker-dealer or agent" to obtain a license under these regulations in order to transact business within the state. *Id.* (citing S.C. CODE ANN. § 35-1-410).  However, "[n]owhere does [the securities title] require attorneys who

merely advise persons involved in a securities transaction to be licensed before providing that advice." *Id.*

As it relates to the issue before this court, i.e. whether Defendants violated Alabama securities law, the court adopts the reasoning of the Georgia, North Dakota, and South Carolina cases. Similar to the pertinent South Carolina statute, the Alabama Code provides that "[i]t is unlawful for any person to transact business in this state as a dealer or agent for securities unless: (1) [h]e or she is registered under this article." ALA. CODE § 8-6-3(a). Significantly, attorneys providing legal advice are not required to register under Alabama securities law. *See* ALA. CODE § 8-6-3 (providing the entities required to register under Alabama Securities law).[11] Therefore, the court finds no persuasive reason to extend secondary liability for securities violations, under ALA. CODE § 8-6-19, to attorneys exercising their "traditional advisory role."[12] Accordingly, Defendants

---

[11] The Alabama statute also requires "investment advisor[s]" to register, *see* ALA. CODE § 8-6-3(b); however, the statute specifically excludes from the definition of "investment advisor" a "lawyer, accountant, engineer, or teacher whose performance of investment advisory services is solely incidental to the practice of that person's profession." ALA. CODE § 8-6-2(18)(c). Thus, while Plaintiffs do not maintain that Defendants were "investment advisors," this section further supports the conclusion that attorneys performing traditional legal services are not covered by this statute.

[12] The court acknowledges the contrary holding in *Prince v. Brydon*, 764 P.2d 1370 (Or. 1988), where, as opposed to focusing on the traditional role of a transactional attorney, the court provided that whether "one's assistance in the sale is 'material' . . . depends on the importance of one's personal contribution to the transaction." *Id.* at 1371. Accordingly, "it is a drafter's knowledge, judgment, and assertions reflected in the contents of the document that are 'material' to the sale." *Id.* However, *Prince* is not persuasive for interpreting Alabama law because Oregon uses different statutory language. *Prince* explicitly states that "the 1967 revision of the Oregon Securities Act substituted, in ORS 59.115(3), the words '*every person who participates*

are not "agent[s] who materially aid" in the sale of securities if they "merely render legal advice or draft documents for use in securities transactions. The definition [of an agent who materially aids] covers persons who assist directly in offering securities for sale, soliciting offers to buy, or performing the sale . . . ." *Hammet*, 868 F. Supp. at 844.

Plaintiffs' opposition to Defendants' motion for summary judgment incorporates by reference the arguments made in their own partial motion for summary judgment. *See* doc. 285, at 39.[13] As it pertains to the sale of Park Tower, LLC "securities," the evidence provided by Plaintiffs fails to establish that Defendants' services exceeded the provision of legal advice or the drafting of documents. First, Plaintiffs assert that "Givhan formed the LLC." Doc. 287, at 9 (citing doc. 153-21). This document is Park Tower, LLC's Articles of Organization, doc. 153-21, and it does indeed provide that Samuel H. Givhan prepared the document. *Id.* at 2. However, this evidence shows only that the

---

or materially aids in the sale' for the words 'every employee of such a seller . . . and every broker-dealer *or agent* who materially aids in the sale . . . .'" *Id.* at 1372 (emphasis added). As such, the court found that, due to this altered statutory language, "the professional role of the person who renders material aid" should not be a defense against liability. *Id.* This difference in the relevant statutory language, and the reliance upon such difference, demonstrates that the *Prince* reasoning is not helpful in the interpretation of Alabama law.

[13] Accordingly, by addressing why Defendants' summary judgment motion is granted for the alleged Alabama securities law violations, the court simultaneously demonstrates why Plaintiffs' motion for partial summary judgment on the same claims is denied. *See* doc. 285, at 39 ("Given that the Summary Judgment briefing of the parties is proceeding on a parallel schedule (and in the interests of economy), Plaintiffs will not repeat the arguments of that Memorandum, which are incorporated by reference.").

Articles of Organization for Park Tower, LLC is a legal document drafted by the company's attorneys—the Defendants.  This fact is inconsequential because the mere drafting of legal documents does not constitute "materially aiding" in the sale of securities.  *See Hammet*, 868 F. Supp. at 844.

Plaintiffs also direct the court's attention to Park Tower, LLC's Operating Agreement which Defendants purportedly prepared.  Doc. 287, at 9 (citing doc. 153-24; doc. 214-7).[14]  This fact also does not carry the day because, even if true, the Operating Agreement, doc. 153-24, is another legal document governing the day-to-day operations of Park Tower, LLC.  By drafting this document, Defendants did not go outside the traditional advisory role of transactional attorneys.  Indeed, nothing indicates that the drafting of this document materially aided in the sale of securities.

Plaintiffs also contend that Defendants "prepared the ownership certificates for Plaintiffs' investments."  Doc. 287, at 9 (citing doc. 153-23).  Yet again, preparing certificates does not materially aid in the sale of securities.  The certificate of ownership evidences, at most, that a securities sale occurred, not that Defendants effected such sale.

Finally, Plaintiffs assert that Defendants acted outside of the traditional advisory function of attorneys because Defendants served as the title and escrow agents during the Park Tower transaction closing.  It is undisputed that Defendants

---

[14] Although not explicitly stated by Plaintiffs, the court assumes that doc. 214-7 is an email from Defendants revealing that they in fact drafted this Operating Agreement.

served as title agents for the title insurance used in the Park Tower property purchase, doc. 281, at 11 (citing doc. 214, at 253-54), and that, as title agents, Defendants benefitted financially from closing the real estate transaction.  Doc. 287, at 8.  However, Plaintiffs attempt to make the tenuous connection that Defendants' financial interest as title agents in the closing created a dual incentive to materially aid in the sale of Park Tower, LLC Class B membership units.  *Id.* Significantly though, Plaintiffs offer no evidence that Defendants, so motivated to receive their commission as title agents, materially aided in the sale of securities to Plaintiffs.  Put differently, title agency for the *real estate* closing between Park Tower, LLC and West Side Square, LLC reveals little, if any, connection to the sale of Park Tower, LLC *securities*.  Moreover, "nothing invidious infects a situation in which the attorney seeks to effectuate the interests of the buyer and the title insurer in completing a real-estate closing."  *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 82 (N.J. 1993); *see also McDougle v. Silverwell*, 738 So. 2d 806, 809 (Ala. 1999) (finding that closing attorney who served dual role as title agent could enforce arbitration provision of title insurance contract).  In other words, as a matter of law, Plaintiffs fail to demonstrate that Defendants could not represent Park Tower, LLC—solely as legal counsel—while also serving as title agent to the Park Tower real estate transaction.

Similarly, Plaintiffs claim that, as escrow agent for the real estate closing and sale of Park Tower, LLC securities, *see* doc. 285, at 24, Defendants materially aided in the sale of securities.  Doc. 281, at 19 (citing doc. 214, at 303-12).

Specifically, Plaintiffs assert that "actually handling the funds in a transaction [is the] hallmark of material involvement" in the securities context. *Id.* Accordingly, Plaintiffs assert that Defendants "sold securities" because they "solicited Plaintiffs' funds" and "Givhan personally executed the Settlement Statement acknowledging that he collected and later disbursed the funds plaintiffs'[sic] paid to purchase the interests sold to them." Doc. 287, at 8 (citing Doc. 279-34).

The court again disagrees. Defendants did not leave the traditional role of transactional attorneys and materially aid in the sale of securities by operating as an escrow agent or holding funds in trust. *See* doc. 285, at 24.[15] While accepting and holding the funds in trust may have aided the transaction's fluidity, such an escrow arrangement did not *effect* the sale of securities. An escrow agent simply adheres to the implicit or explicit agreement by the parties performing the sale at issue; and accordingly, the escrow agent should not be held liable for issues underlying the substance of the sale or transaction absent a basis to do so. *Gurley v. Bank of Huntsville*, 349 So. 2d 43, 45 (Ala. 1977) (holding that an escrow agent "is akin to a special agent and is limited in its liability to the proper performance of those duties and obligations specifically delineated in the escrow agreement for the achievement of a specific goal"). Here, Plaintiffs offer no evidence to support

---

[15] The court notes, as discussed *infra*, that by granting Defendants' motion for summary judgment on the securities law claims, it does not reach the issue of whether Defendants negligently performed their duties as escrow agents. The court finds that Defendants did not *effectuate* or *materially aid* in the sale of *securities*. This is not to say, however, that Defendants did not breach a fiduciary duty in handling the transaction.

the contention that performing the duties of an escrow agent constitutes actions outside the traditional role of a closing attorney. Moreover, even if the duties of an escrow agent fall outside of the attorney's "role," Plaintiffs failed to refute the clear holding in *Gurley*, 349 So. 2d at 45, that escrow agents serve a limited and specific purpose under Alabama law. In short, because Alabama's Blue Sky laws do not indicate that *Gurley* is inapplicable or that an escrow holder materially aids in the sale of securities, Defendants are not liable for the sale of securities by acting as the escrow agent in the underlying sale.

Moreover, the court finds that the *Ainslie v. First Interstate Bank of Or., N.A.*, 939 P.2d 125 (Or. Ct. App. 1997), case Plaintiffs rely on, *see* doc. 281, at 19, is distinguishable because that court's analysis focused on statutory language unique to Oregon. Specifically, Oregon law *required* the use of an escrow arrangement for the type of securities at issue. *Ainslie*, 939 P.2d at 127.[16] Accordingly, the *Ainslie* court found that the statutory rule required "certain escrow terms that differ significantly from usual escrow arrangements." *Id.* at 135. In contrast, there is no similar rule under Alabama's securities law. The closest Rule under Alabama law *allows* the Alabama Securities Commission to require an escrow where the securities offering meets certain conditions. ALA.

---

[16] "An escrow must be established where, because of the nature of the intended use of the funds, nature of the project or business plan, a minimum amount of funds must be raised in order that the project can get underway with a reasonable chance of success even if no further sales are made." *Ainslie*, 939 P.2d at 127 (citing O.A.R. 441-65-160).

ADMIN. CODE r. 830-x-4-.11.[17]  However, here, there is no evidence or allegation that those conditions were met or, more importantly, that the Alabama Securities Commission invoked this Rule.  Therefore, the analysis in *Ainslie* is not premised on the same statutory scheme, and accordingly, is not analogous.[18]  Moreover, here, Plaintiffs never assert that Defendants' actions differed from the "usual escrow arrangement."  Rather, Plaintiffs claim that Defendants' service as traditional escrow agents categorically equates materially aiding in the sale of securities.  *See* doc. 281, at 16.  The court finds no factual or legal support for this claim.

Taking all facts in the light most favorable to Plaintiffs, the court finds that Defendants did not materially aid in the sale of Park Tower, LLC "securities." Rather, Defendants operated as traditional closing attorneys for a real estate

---

[17] "As a condition to registration, where the offering is on a 'best efforts' basis, the success of the venture is dependent on the proceeds of the offering or the issuer is in a promotional or developmental phase, the Commission may require that all or part of the proceeds from the sale of securities be escrowed until the issuer deposits a specified minimum amount from the sale of such securities within a specified period of time to accomplish the purposes of the offering and/or until certain stipulated requirements are met. The escrow agreement shall be in the form suitable to the Commission."  ALA. ADMIN. CODE r. 830-x-4-.11(1).

[18] To a lesser extent, the court in *Ainslie* considered other factors to determine that the escrow agent materially aided in the sale of securities.  939 P.2d at 137-38.  Specifically, in order to support the financial position of the company and therefore entice more securities purchasers, the escrow agent helped form a "second escrow" to "nominally bring the escrow balance up to the amount required for disbursement, even though no additional money would actually be exchanged or would actually come to rest in the escrow account except as a transitory fiction." *Id.* at 130.  Special statutory rules applied to the *Ainslie* escrow agent, who went beyond the traditional depository function to divert funds into a second escrow account that aided in the sale of future securities.  Neither of these factors are currently alleged by Plaintiffs in this action.

transaction, and even if Defendants did perform tasks outside of such role, their involvement did not effect the sale of securities.  Therefore, Plaintiffs' motion for summary judgment is **DENIED**, and Defendants' motion for summary judgment as it relates to the Alabama securities law claims is **GRANTED**.

## D.    Common Law Claims

The § 1031 Plaintiffs also bring two common law tort claims against Defendants.[19]  The first, Count 7, asserts that in the real estate transaction, Defendants negligently, wantonly, or fraudulently "failed to comply with the requirements necessary to effectuate the § 1031 exchange for which the 1031 Plaintiffs otherwise would have qualified."  Doc. 145, at 48.  The second, Count 8, claims that Defendants "negligently, wantonly, recklessly, or intentionally breached their duties to the § 1031 Plaintiffs by not following escrow directions."  *Id.* at 49.[20]  In response to Defendants' motion for summary judgment, the § 1031

---

[19] As stated *supra*, the § 1031 Plaintiffs dropped Count 6 alleging liability under Alabama's Legal Services Liability Act.  Doc. 285, at 38.

[20] Defendants assert that Alabama's "door closing" statute bars § 1031 Plaintiff, SFRC, from bringing any claim in an Alabama court due to SFRC's failure to register to transact business in Alabama at the time of the Park Tower closing.  *See* doc. 279, at 25 (citing ALA. CODE § 10-2B-15.02).  However, the only claim left for SFRC to pursue, *see infra*, is the fiduciary duty of care claim regarding Defendants' performance as the closing attorney and escrow holder.  This claim, sounding in negligence, is not barred because "[a]ctions ex delicto by nonqualified foreign corporations are not prohibited in the courts of Alabama."  *Shiloh Const. Co., Inc. v. Mercury Const. Corp.*, 392 So. 2d 809, 813 (Ala. 1980).  Moreover, the court is not convinced that "any way you slice" this claim, it sounds in contract.  *See* doc. 279, at 27 (citing *Boles v. Midland Guardian Co.*, 410 So. 2d 82, 83-84 (Ala. Civ. App. 1982)).  The essence of § 1031 Plaintiffs' fiduciary duty claim depends on whether Defendants took reasonable care in upholding escrow and closing instructions from the parties at interest.  "Such claim lies independently of the existence of a valid contract."  *Boles*, 410 So. 2d at 84.

Plaintiffs appear to consolidate these two claims into a general contention that Defendants failed to follow the § 1031 Plaintiffs' escrow instructions and wrongfully disbursed funds held in trust.  Doc. 285, at 40-47.  As demonstrated *supra*, California common law governs these tort claims.

The factual basis for these common law tort claims derives from the entity purchasing the Park Tower property.  The § 1031 Plaintiffs contend that they sought a § 1031 like-kind "exchange of property" in the purchase of the Park Tower property for tax deferral purposes.  *See* doc. 285, at 16 (citing T. O'Shea Depo. 258:18-261:20).  *See also* 26 U.S.C. § 1031.  To effectuate a § 1031 exchange, it is undisputed that the property must be owned through an "undivided interest" as opposed to owning interest in a LLC that holds title to the property. *See* doc. 285, at 7; doc. 279, at 13.  However, Park Tower, LLC purchased the Park Tower property—i.e. the property that supposedly effectuated the § 1031 like-kind exchange.  Doc. 279-33, at 6.  The § 1031 Plaintiffs contend that "[w]hen informing the O'Sheas that a successful § 1031 exchange required them to be on title and not purchase interests solely in an LLC, Givhan left them with the impression that he would take care of the matter."  Doc. 285, at 16 (citing T. O'Shea Depo. 258:18-261:20).  Moreover, Givhan, as the closing attorney, received instructions "from WaMu 1031, the 1031 Plaintiffs['] qualified intermediary, directing him to have the seller execute the 'appropriate deed' in favor of Plaintiffs for the Replacement Property."  Doc. 285, at 17 (citing docs. 285-6, 285-7, 285-8).  The § 1031 Plaintiffs assert that on September 21, 2007,

they transferred substantial monies to Defendants for the Park Tower transaction and for the specific purpose of a § 1031 exchange.  Docs. 285-11, 285-12, 285-13. Despite their instructions, the § 1031 Plaintiffs maintain that Defendants, as the escrow agent in the closing, distributed these funds to Park Tower, LLC with the knowledge that the § 1031 Plaintiffs had not executed an "operating agreement assigning Plaintiffs a membership interest in the LLC."  Doc. 285, at 19.  Finally, the § 1031 Plaintiffs allege that Defendants issued an "opinion letter" to Park Tower, LLC's lender that "he had reviewed the operating agreement and that the plaintiffs were members of the LLC."  Doc. 285, at 19 (citing doc. 279-1, at 224:17-227:11).

Thus, the § 1031 Plaintiffs contend that Defendants' handling of the Park Tower transaction, both as closing attorney and escrow agent, resulted in Park Tower, LLC having sole title to the Park Tower property; whereas the § 1031 Plaintiffs, who funded the purchase, had no real interest in Park Tower, LLC. Moreover, the § 1031 Plaintiffs assert that because Defendants failed to comply with their instructions to close the purchase in compliance with § 1031, the § 1031 Plaintiffs incurred substantial costs to reform the deed to comply with § 1031. Doc. 285, at 21.

Defendants, on the other hand, contend that "no one ever told Plaintiffs that Givhan would prepare any documents for a § 1031 exchange."  Doc. 279, at 13 (citing doc. 279-2, at 19).  Defendants assert that during the Park Tower closing, they "only represented" Park Tower, LLC—not the § 1031 Plaintiffs.  *Id.* (citing

doc. 279-1, at 32:16-17; 87:2-22).  Moreover, Defendants claim that the § 1031

Plaintiffs employed other counsel to represent their interests in the Park Tower

closing.  Doc. 279, at 37-38 (citing doc. 279-10, at 13; doc. 279-16).

Accordingly, Defendants contend that they reasonably relied upon

McDermott—Park Tower, LLC's manager—regarding the proper instructions for

closing the Park Tower transaction and disbursing funds from the trust account.

Doc. 279, at 40 (citing doc. 279-1, at 116:6-20).

　　Defendants also maintain that the § 1031 Plaintiffs signed numerous

documents demonstrating that they did in fact own an interest in Park Tower, LLC

prior to the closing of the Park Tower transaction; and accordingly, no "wrongful"

disbursement of funds occurred.  Doc. 279, at 14 (citing docs. 279-37, 279-38,

279-39).  *See also* doc. 279-33, at 6 (the O'Shea Trust signed the Park Tower

property real estate contract on behalf of Park Tower, LLC).[21]

　　California law imposes a fiduciary duty for escrow agents, even if the

parties have no other professional duty to one another.  *Virtanen v. O'Connell*, 44

Cal. Rptr. 3d 702, 713 (Cal. Ct. App. 2006).  "Absent clear evidence of fraud, an

escrow holder's obligations are limited to compliance with the parties'

instructions."  *Summit Fin. Holdings, Ltd. v. Continental Lawyers Title Co.*, 41

---

[21] In response, Plaintiffs state that because they believed that Defendants would follow the § 1031 instructions, they signed the documents as closing documents to effectuate the § 1031 exchange, *not* to purchase an interest in an entity that would essentially destroy the exchange. Doc. 285, at 19-20.

P.3d 548, 552 (Cal. 2002).[22]   Accordingly, under California law, Defendants owe

the § 1031 Plaintiffs a fiduciary duty of care because these Plaintiffs were party to

the escrow arrangement that Defendants held.   *See Kirk Corp. v. First Am. Title*

*Co.*, 270 Cal.Rptr. 24, 37 (Cal. Ct. App. 1990) ("[I]t is the duty of the escrow

holder to exercise ordinary skill and diligence in his employment and if he acts

negligently, he is liable for any loss proximately occasioned by such negligence.").

Taking the facts in the light most favorable to the § 1031 Plaintiffs, the court is

unable to find any factual allegations of fraud, recklessness, or wantonness beyond

mere conclusory statements.   The court does, however, find a genuine issue of

material fact as to whether Defendants breached their duty of care to reasonably

follow the instructions of both parties by distributing the § 1031 Plaintiffs' funds

to Park Tower, LLC during the Park Tower transaction closing.[23]   Therefore, only

this issue of liability is proper to survive summary judgment and proceed to trial.

---

[22] Even though *lex loci delicti* requires this court to apply California law, the court finds that the result is probably consistent with Alabama law.  *See Gurley*, 349 So. 2d at 45 (finding that an "escrow agent is generally considered to be the agent of both parties" and the "escrow instructions constitute the full measure of the agent's obligations").  Moreover, the court disagrees with Defendants' contention that no "escrow agreement" existed here.  Doc. 279, at 38-39.  It is undisputed that Defendants closed the Park Tower transaction by holding Plaintiffs' money in trust and distributing this money to Park Tower, LLC upon closing—the very essence of an escrow arrangement.  *See* docs. 285-11, 285-12, 285-13; *see also* doc.147, at 11.  The question, however, is whether such distribution actually breached Defendants' duty to follow the parties' instructions.

[23] This factual question includes whether it was reasonable for Defendants to rely on McDermott's instructions.  Moreover, any issue of Plaintiffs' contributory negligence as it relates to Defendants executing the closing and escrow instructions is also a factual question.  *See Li v. Yellow Cab Co.*, 532 P.2d 1226, 1230 (Cal. 1975) (adopting the "comparative negligence" approach which "assesses liability in proportion to fault").

Defendants' motion for summary judgment, as it relates to Counts 6, 7, and 8, is **DENIED** as to the alleged fiduciary breach of care, but **GRANTED** in all other respects.

### E.   Elder Abuse Claim

Finally, Tom O'Shea brings a claim against Defendants under California's Elder Abuse statute.  California law imposes civil liability for the "financial abuse" of "elders."  CAL. WELF. & INS. CODE § 15610.30.  To prevail, a plaintiff must demonstrate that defendant "takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."  *Id.* at § 15610.30(a).  Moreover, a "wrongful use" occurs when "the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult."  *Id.* at § 15610.30(b).  The Elder Abuse statute imposes liability when an "elder . . . is deprived of any property right, including by means of an agreement . . . regardless of whether the property is held directly or by a representative."  *Id.* at § 15610.30(c).  And, "representative," in turn, is defined as a "conservator, trustee, or other representative."  *Id.* at § 15610.30(d)(1).

Accordingly, the California statutory language allows Tom O'Shea to recover for harm to the O'Shea Trust—an entity holding Tom O'Shea's personal property—based on the alleged misappropriation of this property by Defendants. However, the only feasible "harm" to the O'Shea Trust, caused by Defendants, arises from Defendants' potential breach of the § 1031 Plaintiffs' escrow/closing

instructions.  *See supra*.  And in that regard, this harm is limited to monies spent reforming the Park Tower deed.  *See infra*.  Because a genuine issue of material fact exists as to that "harm," Defendants' motion for summary judgment on this claim is **DENIED**.[24]

## F.    Damages Available

In their motion for summary judgment, Defendants argue that summary judgment for all claims is warranted because Plaintiffs' settlement with the McDermott Defendants negates any potential damages in this case.  Doc. 279, at 17.  The court disagrees, but first notes that, as discussed *supra*, Defendants are not liable for rescission of the "securities" sold to Plaintiffs.  In order for Plaintiffs to claim rescission as a viable remedy, Defendants must be liable under ALA. CODE §§ 8-6-17; 8-6-19.  However, as the court found, *supra*, Plaintiffs failed to demonstrate any liability under Alabama's Blue Sky laws.  Therefore, Plaintiffs are not entitled to a remedy under these statutes, including attorneys fees.

The § 1031 Plaintiffs may, however, pursue damages for the fiduciary duty claim.  The apparent theory is that Defendants financially injured the § 1031 Plaintiffs through a fiduciary breach because "Plaintiffs incurred substantial costs in pursuing their case against the Real Estate Defendants so as to reform the

---

[24] The court notes that California law allows Tom O'Shea to seek redress for such harm to his trust property.  However, if Tom O'Shea continues to pursue this claim, he must also prove that Defendants "new or should have known that [their] conduct is likely to be harmful to the elder."  CAL. WELF. & INS. CODE § 15610.30(b).  In other words, in order to recover, Tom O'Shea must demonstrate that Defendants acted in bad faith.  *See Teselle v. McLoughlin*, 92 Cal.Rptr.3d 696, 712 (Cal. Ct. App. 2009).

Deed."  Accordingly, the court finds that—assuming the § 1031 Plaintiffs prove

liability for breach of an escrow agent's fiduciary duty—they may "recover for the

expenses they incurred litigating . . . with other [entities] as a result of

[Defendant's] misconduct."  *See* doc. 285, at 29.  As this fiduciary duty claim is

governed by California law, *see supra*, California law also governs the

determination of available damages.  Under California law, if an escrow holder

breaches its duty "he will be responsible for any loss occasioned thereby."

*Virtanen*, 44 Cal.Rptr.3d at 714.  Because the § 1031 Plaintiffs claim no adverse

tax liability as a result of Park Tower, LLC originally holding title to the Park

Tower property, *see* doc. 285, at 25, the sole potential loss at issue is the cost to

reform the deed.[25]  The court rejects Defendants' argument that Plaintiffs are

"merely trying to force [Defendants] to pay for every fee incurred in prosecuting

this action against [Defendants] as well as all of the former co-defendants."  Doc.

286, at 6.  As holder in trust of § 1031 Plaintiffs' funds, Defendants may be liable,

as an escrow agent, for any damages that occurred from negligently releasing

those funds to Park Tower, LLC.  This theory of liability is specific to the

Defendants here, and Defendants may be liable for the cost of such alleged

negligence.

   The court recognizes that, if liability is proven, calculating damages for this

breach requires an analysis of the attorney's fees paid to reform the Park Tower

---

[25] This is the only measure of damages sought by the § 1031 Plaintiffs, outside of their
failed Alabama securities law claims.  Doc. 285, at 26, 29.

deed.  The court is not convinced that "[t]here is simply no way to determine whether [§ 1031] Plaintiffs' counsel's time entries actually relate to 'acquiring title to and reclaiming possession of' the Park Tower property."  Doc. 279, at 23.  As these attorney fees are "damages," they are a factual matter best left to the discretion of the jury.  *See Acree v. Gen. Motors Acceptance Corp.*, 112 Cal.Rptr.2d 99, 110 (Cal. Ct. App. 2001) ("[W]here the fact of damages is certain . . . the amount of damages need not be calculated with absolute certainty.  The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation.").  Moreover, at trial, the § 1031 Plaintiffs may only submit evidence pertaining to damages proximately caused by Defendants' alleged breach of an escrow holder's fiduciary duty of care.

Finally, the court notes that any recovery under Tom O'Shea's Elder Abuse claim is limited to harm suffered by the O'Shea Trust as a result of Defendants' alleged fiduciary breach.  However, the court acknowledges that such harm under the elder abuse claim is identical to any harm under the fiduciary duty claim.  As such, the court refuses to provide a windfall of remedies by allowing Tom O'Shea to "double recover" for the same financial injury.  The court will further address this issue if it becomes necessary to do so.

## IV.   CONCLUSION

For the aforementioned reasons, Plaintiffs' Alabama securities law claims are **DISMISSED with prejudice**.  The § 1031 Plaintiffs' claim under the Alabama Legal Services Liability Act is **voluntarily DISMISSED**.  Trial by jury will be set

for the two remaining issues: (1) whether, under California law, Defendants breached their fiduciary duty as escrow agents to the § 1031 Plaintiffs and (2) whether Defendants violated California's Elder Abuse Statute by taking, secreting, appropriating, obtaining, or retaining real or personal property of Tom O'Shea for a wrongful use or with intent to defraud.  Damages for potential liability under these remaining claims are limited as provided above.

The remaining matters are set for a pretrial conference on **February 8, 2012 at 8:00 a.m.** at the **U.S. Post Office & Courthouse in Decatur, Alabama**, and trial on **March 12, 2012 at 9:00 a.m.** at the **Federal Courthouse in Huntsville, Alabama.**

**DONE** this the 12th day of January, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE